**ABTOX, INC., Plaintiff,**

v.

**EXITRON CORPORATION and Adir Jacob, Defendants.**

**MDT, INC., Plaintiff,**

v.

**ABTOX, INC., Defendant.**

**ABTOX, INC., Plaintiff,**

v.

**MDT CORPORATION, Defendant.**

Civ. A. Nos. 94–10503–MEL, 94–10927–MEL and 94–11937–MEL.

United States District Court, D. Massachusetts.

Sept. 1, 1995.

---

David K. Wanger, William F. Lee, Hale & Dorr, Boston, MA, Ronald L. Wanke, Jenner & Block, Chicago, IL, William L. Anthony, Jr., Noemi C. Espinosa, Robert DeBerardine, Brobeck, Phleger & Harrison, Palo Alto, CA, for plaintiff Abtox, Inc.

John A. Lahive, Jr., Lahive & Cockfield, Boston, MA, for plaintiffs MDT, Inc., Exitron Corporation, Adir Jacob.

Ralph A. Loren, John A. Lahive, Jr., Edward J. Kelly, Lahive & Cockfield, Boston, MA, Keith V. Rockey, Kathleen Ann Lyons Rockey, Rifkin and Ryther, Chicago, IL, for defendant MDT Corp.

LASKER, District Judge.

Abtox, Inc. moves for summary judgment declaring that its plasma sterilizer does not infringe United States Patent Nos. 4,931,261 (the " '291 Patent") or 4,917,586 (the " '586 Patent," and, together with the '261 Patent,

the "Jacob Patents"). MDT, Inc., Dr. Adir Jacob, and Exitron Corporation (together, "MDT") cross-move for summary judgment declaring that Abtox is infringing the Jacob Patents and seek an injunction barring future acts of infringement.

The issues presented are esoteric and highly technical in nature, involving a nomenclature, body of law and form of administrative procedure which are largely unfamiliar to most district judges, including this one. Nonetheless, I have concluded that, under principles of patent claim construction recently articulated by the United States Court of Appeals for the Federal Circuit in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) and *Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d 1570 (Fed.Cir.1995), as applied to Jacob's own statements to the Patent Office during the prosecution of United States Patent No. 4,801,427 (the "'427 Patent"), Abtox has demonstrated that its device does not infringe the Jacob Patents. Therefore, Abtox's motion is granted and MDT's motion is denied.

## I.

### A.

The devices at issue are used to sterilize medical instruments. For many years, such instruments have been sterilized by using ethylene oxide ("EtO") in a process which had the benefit of not harming instruments which do not react well to heat and moisture. EtO, however, is dangerous stuff: among other things, toxic, carcinogenic, flammable and harmful to the ozone layer. The race is on, therefore, to develop alternatives to EtO sterilization in a market that may eventually run into the hundreds of millions of dollars annually.

One promising alternative to sterilization using EtO is plasma sterilization. A plasma is essentially a partially ionized gas. For many years, manufacturers of semiconductors have used a process called plasma etching, in which a plasma—also known as a "glow discharge"—is generated by applying electromagnetic radiation to a stream of gas. Gases are passed into a chamber where an electromagnetic field (at either radio frequency ("RF") or microwave frequency) is used to excite the gas and create the plasma in the chamber. The plasma within the electromagnetic field emits light and contains charged particles such as ions and electrons, and neutral active components (or "neutral active species") such as atoms, excited molecules and free radicals. In the etching process, the plasma, or glow discharge, is applied to silicon wafers in such a way as to etch—or carve—the wafers into integrated circuits.

Shortly after the development of plasma etchers, it was discovered that a glow discharge can be used to sterilize; that is, charged particles and neutral active species in the plasma kill microbes on the surface of objects as well as etch silicon. This insight has led to the development of plasma etchers and plasma sterilizers more or less in tandem.

One problem inherent in placing sensitive materials and instruments directly in the electromagnetic field that generates the glow discharge is that the charged particles contained in the plasma can damage the item being etched or sterilized. However, in some instances, neutral active species can perform certain etch and sterilization processes alone, in the absence of charged particles—in other words, away from the electromagnetic field that generates the glow discharge. This knowledge gave rise to "out-of-field" (also called "field-free" or "glowless") etch and sterilization technology, in which the items to be treated are isolated from the electromagnetic field, as well as the charged particles within that field, by a "Faraday shield"—a barrier made of perforated metal which blocks electromagnetic radiation (and hence charged particles) while allowing neutral active species through.

### B.

Abtox recently received F.D.A. clearance to sell an out-of-field plasma sterilizer in the United States. MDT has not yet marketed a plasma sterilizer, but plans to do so using the technology described in the Jacob Patents. At issue here is Abtox's alleged infringement of two claims of the Jacob Patents: claim 3

of the '261 Patent and claim 6 of the '586 Patent. MDT does not dispute that, if Abtox's device does not fall within the scope of these claims, Abtox is entitled to summary judgment. Conversely, as I understand it, Abtox does not dispute that its device reads on all claims of the Jacob Patents save these claims. The parties agree, therefore, that MDT prevails on its motion if—and only if—Abtox's device falls within the scope of claim 3 of the '261 Patent and claim 6 of the '586 Patent and that, otherwise, Abtox prevails on its motion.

The '261 Patent describes the apparatus of MDT's plasma sterilizer. Claim 3 of the '261 Patent requires the following three elements:

(a) A metallic gas-confining chamber having a non-metallic portion;

(b) A microwave energy source including a microwave cavity positioned to couple microwave energy into said chamber through said non-metallic portion; and

(c) Means for holding ... medical devices and materials to be sterilized within said chamber volume and away from said microwave cavity, and including a perforated electrical shielding member positioned within said chamber and in close proximity to said microwave energy source to provide a portion of the internal volume of said chamber shielded from and away from said microwave energy providing a field-free zone containing said devices and materials.

The '586 patent describes the method of MDT's plasma sterilizer. Claim 6 requires:

A method in accordance with claim 1 [of the '586 Patent, which requires a "gas-tight confining chamber",] where in said chamber there is positioned a perforated metallic shield, said shield being substantially equal to the internal cross section of said chamber and located in close proximity to said microwave energy source, thereby providing a substantially field-free zone immediately beyond it and away from said microwave energy source, said .field-free zone containing said devices and materials.

The present question centers on the meaning and significance of the (indisputably interchangeable) phrases "gas-confining chamber" and "gas-tight confining chamber." (For purposes of convenience, I use the former phrase.) MDT contends that Abtox's device contains a single gas-confining chamber. Abtox argues that its device in fact contains *two* gas-confining chambers and that, furthermore, the reach of the Jacob Patents extends only to single—but not double—chambered sterilizers. Because the Abtox device employs two chambers, the argument runs, it does not infringe on the Jacob Patents.

The parties have introduced scant technical evidence as to what does and does not distinguish a single chambered sterilizer from a double chambered sterilizer. Rather, the dispute has centered on the significance and meaning of certain statements MDT and Jacob have made which, Abtox argues, constitute an admission on the part of MDT—or, alternatively, an estoppel against MDT disputing—that single and double chambered devices are materially distinct.

In September 1987 Jacob was in the process of prosecuting a patent application which described plasma sterilization technology utilizing both microwave and RF electromagnetic energy sources. That month, the Patent Office restricted Jacob to pursuing a patent for either a sterilization method or a sterilization apparatus because the initial application covered more than one potential patent, a condition which is prohibited by 35 U.S.C. § 121. Jacob elected to pursue a method patent. In June 1988, Jacob was further required to elect to pursue a patent describing a method utilizing either a RF or microwave power source. Jacob elected to pursue a RF embodiment, and this twice revised application ultimately resulted in his being assigned the '427 Patent. Jacob later filed a patent application describing an apparatus and method utilizing a microwave energy source. This later application resulted in his being assigned the Jacob (that is, '261 and '586) Patents.

On December 28, 1987, after the Patent Office's action restricting Jacob's initial application and before the issuance of the '427 Patent, the patent examiner rejected, among other claims contained in the application, claims 7 and 38. These claims described,

respectively, a method and apparatus which facilitated a gas plasma flowing through an enclosure. This enclosure was described, in referenced claims 2 and 37, as a "gas-tight confining chamber" and "gas confining chamber," respectively. These are, it will be noted, the precise terms at issue in the current motion. The patent examiner gave as one basis of his rejection of claims 7 and 38 his belief that "[t]o flow the plasma gas through the chamber during the sterilization process in order to increase the effect of the sterilizing plasma gas would be obvious as taught by Fraser et al." The Fraser reference refers to a plasma sterilizer that was in the prior art.

Jacob responded to the patent examiner's rejection on March 21, 1988, withdrawing some claims and amending others. In response to the patent examiner's rejection of claims 7 and 38, Jacob wrote:

> The Fraser reference discloses a method which differs sharply from Applicant's method. In essence Fraser generates his plasma in a nonconducting glass reactor capacitively coupled to an RF source, and exposes materials to be sterilized *in a separate chamber away from and downstream from the plasma generating device. Applicant performs the sterilization process within the confines of the plasma generating device.*
>
> From previous considerations, Fraser's method yields high plasma potentials, coupled with elevated processing temperatures. However, due to this separation, the net concentration of active species reaching the sterilization chamber is substantially reduced by exponential decay processes of these species during their time-of-flight from one place to the other. Fraser's corresponding process' inefficiency manifests itself by its incapability to sterilize material through hermetically sealed enclosing packages ... in clear contradiction to Applicant's method capability.

MDT's April 26, 1995 Hearing Exhibit O (emphasis added). Abtox argues—and MDT does not dispute—that, in plain English, Jacob's statement distinguished the '427 device from Fraser's device on the basis of the fact that Jacob's was a single chambered steriliz-

er (i.e., plasma generation and sterilization occur in a single chamber) and Fraser's a double chambered sterilizer (i.e., plasma generation and sterilization occur in different chambers).

Abtox argues that this excerpt of the prosecution history surrounding the '427 Patent limits the reach of the '427 Patent to a single chambered sterilizer and that Abtox's double chambered device therefore falls outside that reach. Abtox adds, moreover, that the distinction made by Jacob between his device and Fraser's applies with even greater force to Abtox's sterilizer. Abtox's device uses—in addition to, or perhaps as part of (the parties have a dispute on this), a Faraday shield—a restrictor and a distribution manifold to separate the plasma generator from the sterilization chamber. These structures, Abtox claims, create a more significant physical separation of the two chambers than is found in Fraser. The proffered rationale for this barrier is that its benefits outweigh its costs. Abtox concedes that, as Jacob noted to the patent examiner, separation of the plasma source from the sterilizing chamber results in fewer active species reaching the material to be sterilized. However, by reducing the density of the active species that flow into the sterilization chamber, such a process is less harmful to the sterilized material.

MDT contends that Jacob's comments as to the difference between the Fraser device and his is irrelevant because the comments were directed toward an aspect of the '427 Patent (the flow of gas plasma) which is not at issue in this dispute. MDT argues further that the prosecution history of the '427 Patent is inapplicable here because, while the Fraser device and (after the Patent Office's June 1988 restriction) the '427 device are RF sterilizers, the device described by the Jacob Patents and the Abtox device are microwave sterilizers, propositions which Abtox does not dispute.

C.

Abtox points to several instances in which it claims that, either internally or to the public, MDT has drawn the precise distinction between the Abtox sterilizer and the MDT sterilizer which Jacob drew, as dis-

cussed above, between the '427 device and Fraser. The first is a letter of August 17, 1992 from Jacob to Roy Malkin, executive vice president of T.M. Englehart in which Jacob claims that:

> [In] Abtox's system, the sterilization load is placed in a separate chamber downstream and away from the plasma generating chamber, thereby avoiding direct adverse exposure to the plasma glow.

Exhibit A of Abtox's Supplemental Memorandum.

In this litigation, MDT responds—and Abtox does not dispute—that the Malkin letter refers to an Abtox sterilizer different from the accused device in that, by MDT's description, the Abtox device described in the letter did not employ a perforated metallic shield between the plasma source and the sterilization chamber.

The second instance which Abtox presents is an undated internal MDT report entitled "Plasma Sterilization," which states:

> The Abtox process uses a so-called "downstream" plasma system. This approach generates the plasma in a chamber adjacent to the sterilizer chamber. The plasma gas flows from that chamber to the sterilizer chamber, where the load is exposed to only the free radicals. The experience of the semiconductor industry has shown this approach to be less damaging to materials. However, since the active species of a plasma have a limited lifetime (about 3 seconds), some are lost on the way from the plasma chamber to the load....
>
> The sterilizer chamber in the [MDT] system consists of an outer shell and a concentric, grounded electrode inside it. The load is placed inside the chamber and the plasma is generated in the volume between the electrode and the outer shell. This has the advantages of generating the plasma in close proximity to the load and exposes the load from all directions....

Exhibit E of Abtox's Supplemental Memorandum.

MDT contends that the quoted document was directed to the same Abtox device that was the subject of the excerpt of the earlier Malkin letter quoted above.

Finally, Abtox points to a September 15, 1994 internal MDT memorandum in which Chip Moore, presumably a MDT employee, describes presentations at a trade show. Moore states as to Abtox that "they create the plasma outside the chamber, use neutral free radicals, thus can process metal items." Exhibit F of Abtox's Supplemental Memorandum. It is unclear from the memorandum which Abtox product is being described and MDT makes no comment as to its significance.

## II.

■ In *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), the Court of Appeals for the Federal Circuit settled what apparently had been a matter of controversy by stating unequivocally that "construction of a patent claim is a matter of law exclusively for the court." *Id.* at 977 (citations omitted). Further, "[t]o ascertain the meaning of claims, [courts should] consider three sources: The claims, the specification, and the prosecution history." *Id.* at 979 (quoting *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991)). Here, the claims and the specification contained in the Jacob Patents do not speak to the issue at hand: whether there is a material difference between a single gas-confining chamber divided into two parts and two gas confining chambers and, if so, what that difference is.

■ The prosecution history of the Jacob Patents does cast significant light on the question. In *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570 (Fed.Cir. 1995), the court reiterated that "arguments and amendments made during the prosecution of a patent application and other aspects of the prosecution history, as well as the specification and other claims, must be examined to determine the meaning of terms in the claims ... [T]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Id.* at 1576 (citation omitted). Moreover, the Federal Circuit has sanctioned the importation of the prosecution history of one patent into the interpretation of the scope of another patent stemming from a common parent application

to determine the meaning of terms employed in both patents. *See Jonsson v. The Stanley Works,* 903 F.2d 812, 818 (Fed.Cir.1990).

■■■ The definition of claims through the use of prosecution history goes to the issue whether a device literally infringes a patent. If a device is found not to literally infringe, prosecution history is nevertheless also relevant to a determination whether the device infringes under the doctrine of equivalents. If a device would otherwise violate the doctrine of equivalents, "prosecution history estoppel limits the range of equivalents available to a patentee by preventing recapture of subject matter surrendered during prosecution of the patent." *Southwall Technologies,* 54 F.3d at 1579. In practice, there does not appear to be a meaningful distinction between the use of prosecution history in claim interpretation and the operation of prosecution history estoppel. If a patentee claimed—or disclaimed—a particular interpretation of a term or phrase during the prosecution of a patent (or its parent or sibling) the patentee may not reinterpret that term or phrase later when the infringement of that patent is at issue.

The prosecution history of the Jacob Patents contains clear and unambiguous statements to the effect that MDT's device is materially different from devices in which the plasma is generated in an enclosure that is in any way separate from the enclosure in which sterilization takes place. Moreover, I find that Abtox's sterilizer is of this latter type. In the Abtox device, plasma is generated in a long, thin, relatively small space. Once generated, neutral active species are fed by a pressure differential through a restrictor and a distribution manifold into a wider and larger space, which is where the item to be sterilized is placed. The two spaces are thus both conceptually and physically distinct: not only do they have different purposes (plasma generation versus sterilization)—a fact which, by virtue of Jacob's statements, in and of itself materially differentiates the Abtox device from the MDT device—they are also separated by a tangible barrier. These distinctions, furthermore, have a practical manifestation: as noted above, Abtox's design renders its device

slower then MDT's but gentler on the instruments to be sterilized. In sum, I conclude that the Abtox device is a two chambered device and the Jacob Patents describe a single chambered device only. Because the two devices are patentably distinct, there is no literal infringement and, by virtue of prosecution history estoppel, no infringement under the doctrine of equivalents.

■■■ None of the evidence offered by MDT distinguishing the '427 sterilizer from the sterilizer embodying the Jacob Patents on the basis of their respective power sources militated against the plain meaning of Jacob's statements before the Patent Office. The '427 Patent and the Jacob Patents have as their common origin the same patent application employing the terms at issue. "Gas-confining chamber" obviously had a uniform definition, regardless of the particular embodiment's power source, when that original application was filed. Nothing in the record indicates that Jacob's or the patent examiner's understanding of that term became bifurcated—one meaning for microwave, one for RF—when the claims were severed on the basis of their respective power sources in June 1988.

■■■ MDT's statements in the letter, report and memorandum quoted above, Exhibits A, E and F of Abtox's Supplemental Memorandum, support the conclusion reached here. Because these documents are not part of the prosecution history of any patent, they may have no relevance as a matter of patent law. However, they certainly constitute admissions as a basic evidentiary matter. MDT's argument that the Malkin letter and internal report are irrelevant because they describe an earlier Abtox device which did not contain a perforated shield between the purported chambers works, if at all, against MDT. If, as the documents state, the shieldless Abtox device is distinct from the Jacob Patents, the shielded Abtox device can only be more distinct.

\* \* \*

Abtox's plasma sterilizer does not infringe United States Patent Nos. 4,931,261 or 4,917,586. Abtox's motion for summary judgment of noninfringement is granted.

MDT's crossmotion for summary judgment of infringement and for injunctive relief is denied.

It is so ordered.