62 F.3d 1433
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Edward L. GUSSIN, Plaintiff-Appellant,
v.
NINTENDO OF AMERICA, INC., Defendant-Appellee.
 No. 95-1051.
 United States Court of Appeals, Federal Circuit.
 Aug. 3, 1995.
 
 Before RICH, LOURIE, and BRYSON, Circuit Judges.
 DECISION
 LOURIE, Circuit Judge.
 
 
 1
 Edward L. Gussin appeals from an order of the United States District Court for the Central District of California granting summary judgment that claims 1 and 2 of United States Patent 4,782,335 were not infringed by Nintendo of America, Inc. Gussin v. Nintendo of Am., Inc., 33 USPQ2d 1418 (C.D.Cal.1994). Because we agree that Gussin's "Statement of Genuine Issues of Material Fact" was deficient, the court's finding of lack of literal infringement was based on a proper construction of claims 1 and 2, and prosecution history estoppel prevents a finding of infringement under the doctrine of equivalents, we affirm.
 
 DISCUSSION
 
 2
 Gussin was granted U.S. Patent 4,782,335 (the '335 patent) entitled "Video Art Electronic System" on November 1, 1988.[1] The invention is directed to an electronic system for drawing and coloring pictures on a conventional television monitor. A user operates the system using three controls. The first moves a drawing cursor on the screen; the second turns the drawing function on and off; and the third determines the color of the drawing when the drawing function is turned on.
 
 
 3
 Nintendo sells the "Super Nintendo Entertainment System" (SNES), a home video game system that allows a user of the system to play an assortment of video game cartridges on an ordinary television monitor. One such game cartridge that Nintendo developed is "Mario Paint." Like Gussin's invention, the Mario Paint cartridge and the SNES allow a user to draw and color pictures on a television monitor. In addition, the Mario Paint cartridge allows the user to compose music and animate pictures.
 
 
 4
 On July 21, 1993, Gussin sued Nintendo for infringement of claims 1 and 2 of the '335 patent. Claims 1 and 2 are independent claims, which read, in relevant part:
 
 
 5
 1. A video art electronic system for drawing and coloring on a conventional color television video monitor including a television screen having predetermined pixels, comprising:
 
 
 6
 a draw switch ...;
 
 
 7
 means including a first joystick to produce first digital signals representing the "X" and "Y" coordinates of a pixel position of a cursor on the video monitors;
 
 
 8
 means including a second joystick to produce second digital signals representing the color of the cursor on the video monitor;
 
 
 9
 a pixel memory comprising a random access memory (RAM) having digital memory addresses corresponding to the pixels and adapted to be read in correspondence with the conventional horizontal and vertical scanning of the video monitor;
 
 
 10
 first connecting means operative when the draw switch is in its first position to connect said first and second digital signals to said pixel memory so that the color and position of the cursor on the video monitor are written into said pixel memory;
 
 
 11
 means to convert output signals from said pixel memory to conventional color television signals; and
 
 
 12
 means to convert said first and second digital signals to conventional color television signals ... [emphasis added].
 
 
 13
 2. A video art electronics system for drawing and coloring on a conventional color television video monitor including a television screen having predetermined pixels, said system comprising a first and second member positionably movable by an operator ... said system further comprising:
 
 
 14
 a draw switch having a first position for invoking said first mode of drawing and coloring on the video monitor and a second position for invoking said second mode of not drawing and coloring on the video monitor;
 
 
 15
 a pixel memory comprising a random access memory, and means operative in said first mode to store the commanded color of the cursor in said pixel memory ... [emphasis added].
 
 
 16
 The court granted summary judgment in favor of Nintendo because Gussin's "Statement of Genuine Issues of Material Fact" was procedurally deficient and violated the court's local rules. In particular, the court found that Gussin "fail[ed] to specifically identify, in an intelligible manner, [the] facts asserted to be disputed and specific evidence in support of those assertions." Gussin, 33 USPQ2d at 1420. The court further held that Nintendo's accused device was not encompassed by claims 1 and 2 because it did not include, inter alia, a pixel memory that stored actual color data as required by the claims. The court also granted summary judgment that Nintendo did not infringe under the doctrine of equivalents because "Gussin simply may not claim equivalency with subject matter he specifically relinquished during prosecution." Id. at 1428. Gussin now appeals.
 
 
 17
 A court must grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We review the district court's grant of summary judgment de novo.
 
 
 18
 We agree with the district court that summary judgment was appropriate because Gussin's "Statement of Genuine Issues of Material Fact" was deficient. Gussin simply asked nine vague questions that do not set forth evidence that raises a disputed issue of material fact. Moreover, as we analyze below, we agree with the court's alternate conclusion that summary judgment was appropriate because the Nintendo device does not infringe, either literally or under the doctrine of equivalents.
 
 1. Literal Infringement
 
 19
 A literal infringement analysis requires two separate steps. First, the claims asserted to be infringed must be construed to determine their meaning and scope. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc). Second, the claims as construed are compared to the allegedly infringing device. Id. To infringe, the accused device must contain every limitation of the asserted claim. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991).
 
 
 20
 On appeal, Gussin argues that summary judgment was inappropriate because genuine issues of material fact exist regarding the construction of the asserted claims. In particular, Gussin asserts that the declarations of his experts, the admissions of Nintendo's experts during depositions, and the prosecution history of the '335 patent create genuine issues of material fact precluding summary judgment.
 
 
 21
 This court recently rejected similar arguments concerning claim construction in Markman v. Westview Instruments, Inc., 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (in banc), in which we held that claim construction is a question of law amenable to summary judgment. The alleged conflicting opinions of both parties' experts do not create genuine issues of fact precluding summary judgment as to the meaning of the claims at issue. See Markman, 52 F.3d at 983, 34 USPQ2d at 1333 ("When 'legal' experts offer their conflicting views of how the patent should be construed, ... such conflict does not create a question of fact...."). Therefore, we reject Gussin's argument that summary judgment was inappropriate.
 
 
 22
 Gussin further argues that the court improperly construed the "pixel memory" limitation of claims 1 and 2. We disagree. The court properly construed the claims, based on the specification and prosecution history, to require a pixel memory that stores actual color data, instead of one that stores "pointers"[2] to a memory separate from the pixel memory.
 
 
 23
 Both claims 1 and 2 state that the "color data" to be stored in the pixel memory should be the "color of the cursor." Specifically, claim 1 requires a "pixel memory comprising a random access memory (RAM)" into which "the color and position of the cursor on the video monitor are written." Col. 9, 11. 49-58. Claim 2, as amended after reexamination, requires "a pixel memory comprising a random access memory, and means operative in said first mode to store the commanded color of the cursor in said pixel memory." Reexamination Certificate B1 4,782,355, col. 2, 11. 23-25. Thus, both claims require storage of the color of the cursor in the pixel memory rather than permitting the pixel memory to store pointers to color data stored in a separate color memory.
 
 
 24
 The specification and the prosecution history further make clear that the claims, as properly construed, only read on devices that store actual color data in the pixel memory. The patent specification describes the "color data" of the present invention as consisting of "a single six bit data word in which two bits represent the intensity of the color red, two bits represent the intensity of the color blue and two bits represent the intensity of the color green." Col. 5, 11. 64-68, and col. 6, 11. 1-3. As Figure 2 of the patent illustrates, Gussin discloses the use of two memories for storing the color data: a color ROM and a pixel memory. The specification describes the interaction of these two memories:
 
 
 25
 Information as to a picture to be displayed on video monitor 20 is represented electronically by data words stored in the pixel memory 46 at addresses corresponding to the address of the pixels of the video monitor 20.... [T]he position of the joystick 24 determines a six bit color data word from the color ROM 44 which is enabled onto data lines coupled into the pixel memory 46.... [T]he six bit color data word from the color ROM 44 is recorded at the address [in the pixel memory] corresponding to the coordinates of the pixel on the video monitor 20 at which the cursor 18 is located.
 
 
 26
 Col. 6, 11. 16-36. The specification consistently refers to the data that are transferred from the color ROM and stored in the pixel memory as consisting of actual "color data," not a pointer to a separate memory containing the actual color data.
 
 
 27
 The prosecution history further supports a claim construction requiring the storage of actual color data in the pixel memory. During reexamination of the patent, Gussin distinguished his claimed invention from the '867 patent issued to Hill. The '867 patent discloses a home entertainment system that, like the invention disclosed in Gussin's '335 patent, allows a user to draw and paint color images on a conventional television monitor. In its "Office Action in Reexamination," the PTO rejected claim 2 under 35 U.S.C. Sec. 102(b) as being anticipated by the '867 patent. The PTO further rejected claim 1 under 35 U.S.C. Sec. 103 as being unpatentable over the '867 patent in view of other prior art.
 
 
 28
 Gussin filed a "Response to Office Action in Reexamination," in which he distinguished his claims from the '867 patent. Gussin argued:
 
 
 29
 The PTO also fails to understand important differences between the function of the pixel memory in claim 1 of the '335 patent and the pixel memory in Mr. Hill's color palette systems. In Gussin's claim 1, the pixel memory receives and stores digital signals representing the actual color of the cursor. In Mr. Hill's color palette systems, the pixel memory does not receive or store a signal representing the actual color of the cursor. Instead, Mr. Hill's pixel memory receives, and stores a color pointer, namely a signal representing the address of a color in the separate color memory of Hill's color palette systems [emphasis added].
 
 
 30
 In support, Gussin filed the declaration of Hill, the named inventor of the '867 patent, which stated:
 
 
 31
 The devices described in the '335 patent, claims 1 and 2, directly store in a pixel memory the digital value corresponding to the color that the operator has commanded to produce on the screen of a color TV receiver or monitor. The devices described in my '867 patent require an additional color memory to store the digital representation of the color values that the operator creates by mixing together various proportions of the primary colors or by adjusting the hue, saturation and brightness of the signals [emphasis added].
 
 
 32
 Gussin also submitted a declaration in which he argued that claims 1 and 2 were patentable over the '867 patent because "the products described in my '335 patent do not include color memory or color mixing means as described in the '867 patent...."
 
 
 33
 Gussin asserts that these arguments were limited to distinguishing Gussin's claims from the '867 patent based on the use of a separate memory that stores "user-mixed" colors. Gussin therefore argues that the pixel memory limitation should be broadly construed to cover any pixel memory system that stores "pre-mixed" colors. We disagree that Gussin's arguments during reexamination were so limited.
 
 
 34
 While it is true that Gussin distinguished the claimed invention from Hill during prosecution based on the storage of "user-mixed" colors instead of "pre-mixed" colors, Gussin also distinguished the claims from the '867 patent based on the way the pixel memory operates. He consistently argued before the PTO that his invention was distinguishable from the '867 patent because he did not claim a pixel memory that stores a color pointer instead of actual color data. In fact, the examiner specifically noted this distinction when he allowed claim 1:[3]
 
 
 35
 [N]one of the references ... teach a "random access memory" wherein the "color and position of the cursor on the video monitor are written into said pixel memory ", lines 16 and 24-25 of claim 1. Hill does not store color data into the pixel memory, rather he uses the pixel memory to address a second memory which acts as a color palette [emphasis in original].
 
 
 36
 Gussin argues that the examiner's statement in the March 10, 1993 "Office Action in Reexamination" that the " '335 patent is actually a two-memory system" is inconsistent with our claim construction. To the contrary, the examiner's complete statement adds support to our claim construction:
 
 
 37
 The '335 patent is actually a two-memory system. Figure 2 of the '335 patent shows a color memory 44 ("COLOR ROM") and a "PIXEL MEMORY" 46. Memory 46 of the '335 patent is similar to memory 164 of the '867 patent and memory 44 of the '335 patent is similar to memory 166 of the '867 patent, i.e. one is a pixel memory and the other is a color memory. How these two memories interact is different. In the '867 patent the pixel memory reads data out to the address port of the color memory. The '335 patent reads color data into the pixel memory to be stored. Therefore the '867 patent does not store color cursor data in it's [sic] pixel memory [emphasis in original].
 
 
 38
 The examiner, accepting Gussin's argument in his "Response to Office Action in Reexamination," merely emphasized the difference between how the pixel memory in each system interacts with the rest of its respective system--the key distinction being that "the '867 patent does not store color cursor data in it's [sic] pixel memory." Based on the foregoing, we conclude that claims 1 and 2, as properly construed, require that the pixel memory store actual color data, not merely pointers to color data stored in a separate memory.
 
 
 39
 Finally, Gussin argues that even if the claims require that the pixel memory store actual color data, genuine issues of material fact exist as to whether Nintendo's SNES device meets this limitation. In support, Gussin claims that Nintendo's expert witnesses admitted in their declarations and during depositions that the SNES stores actual color data. However, the declarations indicate instead that the pixel memory in the SNES device stores pointers rather than actual color data, and the deposition testimony relied upon by Gussin is not inconsistent with these declarations. Thus, Gussin has failed to establish the existence of any genuine issue of material fact regarding the operation of the pixel memory of the SNES device.
 
 
 40
 We need not address Gussin's other asserted errors in the district court's claim construction and infringement analysis. Our determination that Nintendo's SNES device does not meet the pixel memory limitation as properly construed is sufficient to cause us to affirm the trial court's grant of summary judgment that Nintendo's device does not literally infringe. See Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 547, 31 USPQ2d 1666, 1671 (Fed.Cir.1994) ("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement.").
 
 2. Doctrine of Equivalents
 
 41
 An accused product that does not literally infringe may still infringe under the doctrine of equivalents. However, the doctrine of prosecution history estoppel limits the application of the doctrine of equivalents by preventing a patentee from using the doctrine to recapture subject matter previously surrendered in order to procure issuance of the patent. Southwall Technologies Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579, 34 USPQ2d 1673, 1679 (Fed.Cir.1995). As discussed above, Gussin expressly distinguished his invention from the '867 patent during prosecution of the '335 patent based on two arguments: 1) his invention uses pre-mixed colors, not user-mixed colors; and 2) his invention stores actual color data in its pixel memory, not pointers. As indicated in his reasons for allowance, the examiner allowed the claims based on these distinctions. Therefore, prosecution history estoppel prevents a finding of infringement under the doctrine of equivalents against any device, including Nintendo's SNES device, that uses a pixel memory which stores pointers instead of actual color data. The court's grant of summary judgment of noninfringement under the doctrine of equivalents was proper.
 
 
 
 [1]
 On November 20, 1992, the U.S. Patent and Trademark Office (PTO) granted a request for reexamination of the '335 patent in view of several prior art references, including U.S. Patent 4,200,867 (the '867 patent) issued to Hill and entitled "System and Method for Painting Images by Synthetic Color Signal Generation and Control." A reexamination certificate issued on September 21, 1993, indicating that claim 1 had been confirmed and claim 2 had been allowed after certain amendments
 
 
 [2]
 A "pointer" is "[a] data item that specifies the location of another item." THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS 964 (5th ed. 1993)
 
 
 [3]
 During reexamination, Gussin added the pixel memory limitation to claim 2. The examiner allowed the claim following Gussin's amendment. We construe the pixel memory limitation in both claims 1 and 2 identically. It is clear from Gussin's "Response to Office Action in Reexamination" and the examiner's "Notice of Intent to Issue Reexamination Certificate" that both Gussin and the examiner construed the pixel memory limitation similarly for both claims 1 and 2