Heidelberg Harris v. MAN Roland          CV-95-309-B     03/25/98

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Heidelberg Harris, Inc., et al.**

    **v.**                                                    C-95-309-B

**MAN Roland, Inc., et al.**



**MEMORANDUM AND ORDER**


Heidelberg Harris, Inc. manufactures and sells the Sunday Press, a high-speed offset printing press.  A competitor, MAN Roland, Inc., contends that the Sunday Press infringes U.S. Reissue Patent No. 34,970 (the "'970 patent") both literally and under the doctrine of equivalents.  Heidelberg challenges both claims in a motion for summary judgment.  It argues that the Sunday Press does not literally infringe the '970 patent because the Sunday Press employs a print cylinder with a clamping channel to secure the printing plate to the print cylinder whereas the '970 patent covers only presses with clampless print cylinders. Heidelberg also claims that MAN Roland cannot succeed with its infringement by equivalents claim because the patent's inventor

surrendered the right to claim that the patent covered print cylinders with clamping channels when he obtained the patent. As I explain below, Heidelberg is correct on both counts. Accordingly, I grant its motion for summary judgment.

## I.   BACKGROUND

### A.   Offset Printing

Offset printing is a process in which ink is applied to a printing plate (also called the printing form or print form), the inked image is printed onto a rubber-covered cylinder, and the image is transferred from the cylinder to paper or another material.  Offset presses typically employ three rotating cylinders to accomplish the printing process: a print cylinder to which the printing plate is affixed; a transfer cylinder covered by a rubber transfer form onto which the inked image is printed; and an impression cylinder that brings the paper into contact with the transfer cylinder.  The typical arrangement of these three cylinders is depicted in Figure 1.

2

Figure 1

Printing plates traditionally have been mounted on print cylinders through the use of a clamp extending the length of the cylinder.  This mounting method has limitations, however, because when a print cylinder includes a clamp, it loses its balanced configuration, which in turn causes vibratory stresses when the press is operated at high speeds.  In addition, the point at

3

which the ends of the printing plate are clamped to the print cylinder produces a gap that prevents "endless printing."

B.    **The Sunday Press**

The Sunday Press's print cylinder represents a refinement in the traditional means of mounting printing forms.  Although a clamp extends the length of the print cylinder, the clamp is much less cumbersome than in other offset presses, interrupting the surface only to a negligible extent.  The less cumbersome clamp also results in less weight differential in the print cylinder, allowing the press to operate at a much higher speed than earlier offset presses.

C.    **The '970 Patent**

MAN Roland acquired the '970 patent from the inventor, Udo Tittgemeyer.  The patent, issued in June 1995, purports to describe: "[a] printing method and apparatus which uses a sleeve-shaped printing form attached to a rotating body.  The sleeve-shaped form conveniently permits the printing operation to be performed continuously and on both sides of the print carrier simultaneously."  All of the patent's pertinent claims describe the print cylinder as a "cylindrical rotating body."  The '970 patent is a reissue of U.S. Patent No. 4,913,048 (the "'048 patent") which also describes the print cylinder as a "cylin-drical rotating body."

4

1. <u>The Patent Claims</u>

Although the '970 patent contains several independent claims (each claiming a separate, patented invention), claim 24 is the only independent claim added as a result of the patent's re-issuance and the only one MAN Roland asserts that the Sunday Press infringes. The other claims MAN Roland contends are infringed -- i.e., claims 25 through 27 -- depend on and, therefore, include all of the elements recited in claim 24. Claim 24 reads in pertinent part:

> An offset printing apparatus comprising:
>
> > a frame;
> >
> > a <u>cylindrical rotating body</u> supported in said frame;
> >
> > a replaceable print form comprising at least a first water absorbing layer and a second ink retaining layer defining an ink transferring pattern deposited on an outer surface; said <u>replaceable print form is mounted and radially supported on said cylindrical rotating body</u>;
> >
> > an ink transfer cylinder rotatingly mounted in said frame adjacent to said replaceable print form; [and] . . .
> >
> > a <u>transfer sleeve</u> [(i.e., a transfer form)] mounted and <u>radially supported on said ink transfer cylinder</u> . . . .

(Def.'s App. Supp. Summ. J. at 10-11) (emphases added).

Claim 25 reads: "An apparatus according to claim 24 wherein said replaceable printing form is a sleeve-shaped print form." (Def.'s App. Supp. Summ. J. at 11.) Claim 26 reads: "An appara-

5

tus according to claim 24 wherein said transfer sleeve exhibits an outer rubber layer." (Def.'s App. Supp. Summ. J. at 11.) Claim 27 reads: "An apparatus according to claim 24 further comprising an air cushion between said transfer cylinder and said transfer sleeve actuable for lifting said transfer sleeve for mounting." (Def.'s App. Supp. Summ. J. at 11.)

Although not asserted as infringed, the '970 patent's other independent claims also describe the print cylinder contemplated by the inventor as a "cylindrical rotating body." Claim 1 reads: "A method for offset printing comprising: releasably mounting a sleeve-shaped print form to a <u>cylindrical routing</u> [sic] <u>body</u>, said sleeve-shaped print form comprising a first material layer for absorbing water and a second material layer for absorbing ink . . . ." (Def.'s App. Supp. Summ. J. at 9) (emphasis added). Claim 7 reads: "An offset printing apparatus comprising: a <u>cylindrical rotating body</u> bearing supported in a frame; . . . a sleeve-shaped print form comprising a first water absorbing layer and a second ink retaining layer defining an ink transferring pattern . . . ." (Def.'s App. Supp. Summ. J. at 10) (emphasis added). Claim 21 reads: "An offset printing apparatus comprising: a frame; . . . [a bearing releasably] connected to said frame and releasably connected to said <u>cylindrical rotating body</u>; a sleeve-shaped print form comprising at least a first water

6

absorbing layer and a second ink retaining layer defining an ink transferring pattern . . . ." (Def.'s App. Supp. Summ. J. at 10) (emphasis added).

2.    The Patent Specification

The '970 patent's specification compares the form and function of offset printing presses described by the prior art with the form and function of the various inventions claimed within the patent. Specifically, it describes how in the prior art, the clamping mechanism used to secure a flat print form to a print cylinder prevented seamless printing and caused vibrational stresses that limited printing velocity. To cure both deficiencies, the specification announces that the inventions claimed by the patent will substitute cylinder clamping mechanisms with fully cylindrical, clampless cylinders on which tubular, sleeve-shaped forms can be mounted.

With respect to seamless printing, the specification notes that in lithographic presses described by the prior art, "printing forms clamped onto the surface of a cylinder were used, . . . so that the clamping strips . . . mark[ed] the onset and the end of the print form. No endless images could therefore be printed by this process." Formerly, only direct, non-offset printing methods, such as gravure printing, could be used to achieve seamless results. Compared to offset printing, however, direct

7

printing was expensive and produced a low-quality product.  The specification states that the patented inventions will combine the inexpensive quality of offset printing with the endless printing capabilities of direct printing by eliminating "heavy printing cylinders with clamping channels" and replacing them with lightweight cylinders onto which "sleeve shaped printing forms [are] mounted."

With respect to high speed printing, the specification notes that in lithographic presses described by the prior art, the use of a clamping mechanism to hold a flat print form to the print cylinder produced an asymmetrical cylinder profile.  Such asymmetry created weight imbalances in the cylinder that, in turn, generated "high vibratory stresses."  Thus, in the prior art, presses required "heavy printing cylinders" operating at "low rotating velocities" to dampen the effects of the asymmetry.  The specification posits that the patented inventions will allow higher rotating velocities by eliminating "heavy printing cylinders with clamping channels" and replacing them with light-weight cylinders onto which "sleeve shaped printing forms [are] mounted."  "These light rotating bodies or cylindrical jackets can be accelerated rapidly to high rotating velocities, without danger of introducing unacceptable vibratory stresses . . . due to balance deviations."  The specification also states that

8

transfer forms and cylinders can be configured in a similar manner.

    3.   The Prosecution History

The '970 patent was the culmination of three applications -- the original, continuing, and reissue applications -- requiring ten separate submissions to the U.S. Patent and Trade Office.  I summarize the relevant references in each application's prosecution history.

        (a)   The Original Application

Tittgemeyer submitted the original application in December 1986.  As originally filed, each independent claim described the print cylinder as a "rotating body" onto which a "sleeve-shaped print form" could be mounted.  The Patent Office twice rejected Tittgemeyer's claims on the ground that they were obvious in view of the prior art.  In an effort to distinguish his claims, as part of Tittgemeyer's third submission, he recharacterized the print cylinder as a "cylindrical rotating body."  In doing so, he explained, "Claim 21 as amended recites 'a <u>cylindrical</u> rotating body bearingly supported in a frame.'  The plate cylinder 12 in Norton [a patent cited by the examiner in rejecting Tittgemeyer's second submission] is not cylindrical in the true sense as provisions must be made for the clamping elements 19 and 20." (emphasis in original).  Rather than addressing this submission

9

on its merits, the Patent Office rejected it on the ground that the appropriate response to its rejection of the second submission was an appeal rather than the filing of a third submission.

(b) The Continuing Application

Tittgemeyer refiled the third submission as a continuing application in February 1989. The Patent Office rejected the application once before issuing the '048 patent in December 1989. The '048 patent continued to use the term "cylindrical rotating body" to describe the print cylinder covered by the patent.

(c) The Reissue Application

Tittgemeyer filed the reissue application in April 1992.[1] The Patent Office eventually issued the '970 patent after a total of five submissions. In a supplemental communication filed with the Patent Office while the second submission was under consideration, Tittgemeyer explained that he was seeking a reissue patent because he wanted the patent to cover devices using either print cylinder sleeves or transfer cylinder sleeves

---

[1] "Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, . . . by reason of the patentee claiming more or less than he had right to claim in the patent, the [Patent Office] shall, on the surrender of such patent, . . . reissue the patent for the invention described in the original patent." 35 U.S.C.A. § 251 (West 1984). "No new matter shall be introduced into the application for reissue." Id.

independently of each other and this goal had not been accomplished by the '048 patent.

In his first four submissions, Tittgemeyer substituted the generic term "print form cylinder" for the term "cylindrical rotating body" when describing the print cylinder covered by the reissue application's new claims.  He also used the term "replaceable print form" rather than a "sleeve-shaped print form" in describing the types of print forms covered by claim 24, one of the new independent claims.  The Patent Office rejected all four submissions on the ground that they were obvious in view of the prior art.  In his fifth and final submission, Tittgemeyer returned to his use of "cylindrical rotating body" to describe the print cylinder covered by the new claims.  The Patent Office approved the fifth submission and issued the '970 patent in February 1995.


## II.  DISCUSSION

A device accused of infringing a patent claim can do so either literally or under the "doctrine of equivalents." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995).  Literal infringement occurs where the accused device exactly reproduces every limitation set forth in the claim at issue.  Id.  An accused device infringes a claim under the

11

doctrine of equivalents when every limitation in the claim either is literally present or when only "insubstantial differences" distinguish the missing limitation and the corresponding aspects of the accused device. Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997). If an accused devise lacks one or more of the claim's limitations, either literally or equivalently, an infringement action based on the claim cannot succeed. Regents of the Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1572 (Fed. Cir. 1997). Further, in cases such as this, where the accused device is alleged to infringe both an independent claim and several dependent claims, all of the infringement claims fail if the independent claim is not infringed. Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1199 (Fed. Cir. 1994).

Infringement analysis entails a two-step inquiry. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). First, the court must determine the scope and meaning of the purportedly infringed claim as a matter of law. Southwall Techs., Inc., 54 F.3d at 1575. Second, the finder of fact must compare the accused device to the properly construed claim to determine whether an infringement has occurred. Id. At the second step, the patent-holder bears the burden of proving by a preponderance of the evidence that each of

12

the claim's limitations are found either literally or equiva-
lently in the accused product. Wolverine World Wide, Inc., 38
F.3d at 1196.

Though the resolution of an infringement claim requires an
inquiry into the supporting facts, a court may summarily dispose
of the claim if no genuine factual dispute exists as to whether
the accused device infringes the claim as construed.
Phonometrics, Inc. v. Northern Telecom, Inc., 133 F.3d 1459,
1463-64 (Fed. Cir. 1998); Sage Prods., Inc., 126 F.3d at 1423.  A
claim of infringement by equivalents may also be disposed of on a
motion for summary judgment if the patent's prosecution history
establishes that the patent-holder surrendered the right to argue
that one or more of the claim's limitations are substantially
equivalent to corresponding elements of the accused device.  See
Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 117 S. Ct. 1040,
1053 n.8 (1997).

The sole independent claim at issue in this case is limited
to presses on which a print form is mounted on a "cylindrical
rotating body."  Heidelberg argues that its press cannot
literally infringe either this claim or the claims dependent
upon it because Heidelberg's press has a print cylinder with a
clamping channel that prevents it from being considered
"cylindrical."  Heidelberg also contends that MAN Roland is

13

estopped from arguing that the Sunday Press infringes the patent under the doctrine of equivalents because MAN Roland surrendered the right to make this claim when it prosecuted the patent. As the only fact material to the resolution of these arguments -- namely, that the print cylinder in the Sunday Press has a clamping channel -- is not in dispute, I resolve both claims as a matter of law.

**A.   Literal Infringement**

1.   The Claim Construction Process

The process of patent claim construction, like the process of statutory interpretation, is far from an exact science. Nevertheless, in an effort to guide the district courts and provide a measure of predictability to the process, the Federal Circuit has developed a set of claim construction rules. The most important of these rules is that a court must first look to any intrinsic sources of meaning before resorting to extrinsic sources such as expert testimony or dictionary definitions. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996). If the meaning of a claim can be ascertained through reference to intrinsic evidence, it is improper to rely on extrinsic evidence to reach a contrary conclusion. Id. The policy reason underlying this rule is that third parties whose rights may be restricted by a patent should be entitled to rely

14

on the public record in determining the scope of a claimed invention. Id.

Three sources of intrinsic evidence may prove relevant to the process of claim construction. The first is the language of the claim itself. Claim language should be given its ordinary meaning unless the rest of the intrinsic evidence suggests that a different meaning was intended. Id. at 1582. Ordinarily, patent terms should be given a consistent meaning throughout all claims in the patent. Southwall Techs., Inc., 54 F.3d at 1579.

A second source of intrinsic evidence is the patent's specification, a technical description of how an invention functions and what it produces. Although the specification cannot be used to change a claim's meaning, see Markman, 52 F.3d at 980, the Federal Circuit has stated that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Vitronics Corp., 90 F.3d at 1582.

Finally, a court also must consider a patent's prosecution history. Id. As the "undisputed public record of proceedings" in the Patent Office, it is of "primary significance in understanding the claims." Markman, 52 F.3d at 980 (internal quotations omitted). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that

15

was disclaimed during the prosecution.  Claims may not be construed one way during the prosecution in order to obtain their allowance and in a different way against accused infringers." Southwall Techs., Inc., 54 F.3d at 1576 (internal citations omitted).  When construing claim terms in a reissue patent, the court must examine the prosecution history of both the original application and the reissue application.  See Markman 52 F.3d at 982.

### 2.  The Patent Claims

The '970 patent's four independent claims all describe the print cylinder on which the print form is mounted as a "cylindrical rotating body."  Heidelberg contends that the term does not include print cylinders with clamping channels.  MAN Roland argues that the term encompasses any type of print cylinder that is roughly cylindrical, whether or not it has a clamping channel.  As the claim language does not definitively rule out either proposed construction, I turn to the patent's specification and prosecution history to resolve the dispute.

### 3. The Patent Specification

Although the specification does not expressly define "cylindrical rotating body," it shows only a channelless print cylinder without clamping elements.  The specification also explains how the print cylinder described in the patent differs

from the "deficient" prior art cylinders which contained clamping channels. In particular, the specification describes how the use in the prior art of clamps to secure a flat print form to the print cylinder prevented seamless printing and caused vibrational stresses that limited printing speed. To cure both deficiencies, the specification announces that the inventions claimed by the patent will substitute prior art cylinder clamping mechanisms with fully cylindrical, clampless cylinders onto which tubular, sleeve-shaped print forms can be mounted. The specification offers no indication that the inventions claimed by the patent extend to presses having a print cylinder with a clamping channel. Thus, the specification provides unambiguous support for Heidelberg's position that the term "cylindrical rotating body" covers only print cylinders without a clamping mechanism. See Vitronics Corp., 90 F.3d at 1582; Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1566 (Fed. Cir. 1992).[2]

    4.    The Prosecution History

    The prosecution history of the '970 patent and its prede-

---

[2] To the extent that MAN Roland argues that the specification cannot be considered because it does not contain a special definition of "cylindrical rotating body," its argument is inconsistent with Federal Circuit precedent. See Vitronics, 90 F.3d at 1582 (specification acts as a dictionary when it defines terms either expressly or by implication); Minnesota Mining & Mfg. Co., 976 F.2d at 1566.

17

cessor, the '048 patent, removes any remaining doubt as to the meaning of the term "cylindrical rotating body." As originally filed, each independent claim in Tittgemeyer's first patent application described the print cylinder merely as a "rotating body" onto which a "sleeve-shaped" print form could be mounted. Tittgemeyer first added the qualifying term "cylindrical" to this description in his third submission of the original application. He refiled the third submission as a continuing application in February 1989 and again described the print cylinder as "cylindrical." In his remarks explaining these submissions, Tittgemeyer defined the term by reference to the prior art he was attempting to distinguish. He first noted that his amended claim encompassed "a <u>cylindrical</u> rotating body bearingly supported in a frame" (emphasis in original). He then stated that "the plate cylinder in Norton [(a prior patent)] is not cylindrical in the true sense as provisions must be made for the clamping elements 19 and 20." Thus, he defined the term "cylindrical" by distinguishing Norton and stating that a print cylinder with a clamping channel is not "cylindrical in the true sense."

Though Tittgemeyer initially attempted to describe the print cylinder covered by the reissue application's new claims generically as a "print form cylinder," he resorted to the prior term "cylindrical rotating body" in his final application. Moreover,

18

Tittgemeyer made no attempt when prosecuting the reissue application to give the term a different meaning with respect to the new claims. Accordingly, MAN Roland concedes that the term has the same meaning in both the '048 and '970 patents. Given the limiting definition that Tittgemeyer gave to the term "cylindrical" during the prosecution of the '048 patent, MAN Roland, as Tittgemeyer's successor in interest, seemingly is in no position today to argue for a more expansive interpretation. See Southwall Techs., Inc., 54 F.3d at 1576.

5.   MAN Roland's Arguments

MAN Roland nevertheless contends that Tittgemeyer's purpose in seeking the reissue patent was to correct an error in the '048 patent by claiming the use of a sleeve-shaped transfer element in combination with any means of mounting a print form on a print cylinder. Accordingly, MAN Roland argues that Heidelberg's proposed interpretation of "cylindrical rotating body" should be rejected because it would defeat the very purpose of the reissue application. Regardless of whether Tittgemeyer subjectively intended his invention to encompass embodiments involving print cylinders both with and without clamps, however, the Patent Office repeatedly rejected his submissions when he broadly attempted to obtain patent protection for embodiments employing the generic term "print form cylinder." It was only after he

19

returned to the narrower and previously defined term "cylindrical rotating body" that he succeeded in obtaining the reissue patent. Because the inventor chose a previously defined term in limiting the scope of the new claims in the reissue application, the scope of the patent protection afforded his successor in an infringement action is likewise limited.

MAN Roland next relies on the doctrine of claim differentiation, arguing that independent claim 24 should be read to cover print cylinders with a clamping mechanism because to do otherwise would render dependent claim 25 superfluous. See e.g., Beachcombers v. WildeWood Creative Prods., Inc., 31 F.3d 1154, 1162 (Fed. Cir. 1994). Claim 24 is limited to devices having a "replaceable print form" that is "mounted and radially supported on said cylindrical rotating body." Claim 25 specifies an "apparatus according to claim 24 wherein said replaceable printing form is a sleeve-shaped printing form." The premise underlying MAN Roland's argument is that the only type of print form that can be mounted on a clampless print cylinder is a sleeve-shaped print form. Therefore, if claim 24 is limited to clampless print cylinders, MAN Roland reasons, it will merely duplicate claim 25. I reject MAN Roland's argument because its underlying premise is flawed. As MAN Roland apparently conceded at oral argument, a print form need not be sleeve-shaped in order

to be mounted on a clampless plate cylinder.  See e.g., U.S.
Patent No. 4,676,161 (1987) (entitled "Magnetic Cylinders with
Image Plate or Blanket for Offset Printing"); U.S. Patent No.
4,005,653 (1977) (entitled "Vacuum Cylinder for Printing
Presses").  Thus, even under Heidelberg's definition of
"cylindrical rotating body," claim 24 provides Tittgemeyer with
broader patent protection than claim 25 because claim 25 is
limited to sleeve-shaped print forms, whereas claim 24 covers
both flat-but-clampless and sleeve-shaped print forms.[3]

As a fallback measure, MAN Roland argues that the '970
patent should be construed to exclude only print cylinders with a
pronounced clamping mechanism that results in a large gap when
the print form is mounted on the print cylinder.  The Sunday
Press would not be excluded by this construction, MAN Roland
argues, because it has a sophisticated clamping mechanism that
produces only a very small gap in the print form.  MAN Roland

---

[3]  I would not reach a different conclusion even if Heidel-
berg's interpretation of claim 24 would give it a meaning no
broader than claim 25.  As the Federal Circuit has acknowledged,
"[a]lthough the doctrine of claim differentiation may at times be
controlling, construction of claims is not based solely on the
language of other claims; the doctrine cannot alter a definition
that is otherwise clear from the claim language, description, and
prosecution history."  O.I. Corp. v. Tekmar Co., 115 F.3d 1576,
1582 (Fed. Cir. 1997).  In this case, the specification and
prosecution history of the '970 patent leave no doubt as to the
meaning of the term "cylindrical rotating body."  Accordingly,
MAN Roland cannot rely on the doctrine of claim differentiation
to support a contrary interpretation.

21

bases its contention on its interpretation of the prior art which Tittgemeyer was attempting to distinguish when he limited his patent to presses with "cylindrical" print cylinders. I am unpersuaded by this argument as it would require the adoption of a tortured interpretation of the term "cylindrical rotating body" which is inconsistent with both the patent's specification and its prosecution history. In distinguishing the prior art that employed a print cylinder with a clamping mechanism, Tittgemeyer carefully defined the term "cylindrical" by stating that a print cylinder is not "cylindrical" unless it is truly cylindrical and is constructed without a clamping channel. Nothing in the record supports a different interpretation.

In summary, both the specification and the prosecution history of the '048 and '970 patents establish that when these patents refer to the term "cylindrical rotating body," they cover only truly cylindrical print cylinders without a clamping channel. The only independent claim on which MAN Roland bases its infringement claim contains this limitation. Because it is undisputed that the Sunday Press employs a print cylinder with a clamping channel, Heidelberg is entitled to summary judgment with respect to MAN Roland's literal infringement claim.

**B.    Equivalent Infringement -- Prosecution History Estoppel**

Heidelberg challenges MAN Roland's infringement by

22

equivalents claim by contending that the claim is barred by the doctrine of prosecution history estoppel. This defense prevents a "patentee from enforcing its claims against otherwise legally equivalent structures if those structures were excluded by claim limitations added [during prosecution of the claims] in order to avoid prior art." Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 866 (Fed. Cir. 1993). In Warner-Jenkinson Co., the Supreme Court rejected an effort to expand the defense to cover any subject matter surrendered during the prosecution of a patent, regardless of the reason for the surrender. 117 S. Ct. at 1049-50. Nevertheless, the Court placed the burden on the patent-holder to establish that a claim limitation was effected for a reason unrelated to patentability. Id. at 1051. If the patent-holder cannot meet this burden, the Court held, he or she will be estopped from claiming infringement by equivalents. Id. Of course, whether prosecution history estoppel applies in a given case presents a question of law for the court to resolve. Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1476 (Fed. Cir. 1998).

As I have already explained in some detail, Tittgemeyer changed the description of the print cylinder in his original patent application from a "rotating body" to a "cylindrical rotating body" in an effort to distinguish his invention from the

23

prior art which taught the mounting of a print form on a print cylinder via a clamping channel.[4] He also defined the term "cylindrical" narrowly during the patent's prosecution history so as to avoid the prior art. Accordingly, this case appears to present the "classic case" for the application of prosecution history estoppel. See, e.g., 5 Donald S. Chisum, Chisum on Patents § 18.05(2)(a), at 18-158 (1997) ("The classic occasion for the application of [prosecution history] estoppel is where the patent examiner rejects a broad claim as unpatentable over the prior art and in response the applicant cancels or amends claims in order to narrow the scope of the claimed subject matter and thereby to secure issuance of the patent.").

MAN Roland nevertheless argues that prosecution history estoppel does not apply in this case because Heidelberg cannot prove that the Patent Office relied on Tittgemeyer's limiting language when it issued the patent. To support its position, MAN Roland points to the fact that the Patent Office required additional amendments after Tittgemeyer limited his claim to "cylindrical" print cylinders. I reject this argument because MAN Roland's evidence at best is equivalent and, therefore, fails

---

[4] The fact that Tittgemeyer initially offered this amendment with respect to a different claim is inconsequential. Southwall Techs., Inc., 54 F.3d at 1583 ("[O]nce an argument is made regarding a claim term so as to create an estoppel, the estoppel will apply to that term in other claims.").

to satisfy MAN Roland's burden to demonstrate that Tittgemeyer added the limitation for reasons unrelated to patentability.  See Warner-Jenkinson Co., 117 S. Ct. at 1051.  While it is true that the Patent Office required additional amendments before it issued the '048 patent, that fact does not establish that the limitation at issue was inconsequential.  Rather, the most likely explanation for the Patent Office's actions is that it found Tittgemeyer's application objectionable for multiple reasons and, therefore, required multiple amendments before the patent could issue.  As the Federal Circuit has recently observed, the fact that a patent-holder ultimately succeeded in obtaining the patent by distinguishing the prior art through multiple amendments is not determinative of a prosecution history estoppel claim based on a single amendment.  Gentry Gallery, Inc., 134 F.3d at 1477; see also Southwall Techs., Inc., 54 F.3d at 1582.  Here, the prosecution history reveals that Tittgemeyer added the term "cylindrical" to avoid the prior art.  The fact that he also made other amendments to distinguish other patents is inconsequential.

MAN Roland's final argument is that any prosecution history estoppel should be limited strictly to the prior art that Tittgemeyer attempted to distinguish.  The Federal Circuit has considered and rejected this argument on multiple occasions.

25

See, e.g., Southwall Techs., Inc., 54 F.3d at 1581, 1583; Haynes Int'l, Inc. v. Jessop Steel Co., 8 F.3d 1573, 1579 (Fed. Cir. 1993); Wang Labs., Inc., 993 F.2d at 867-68.  Rather than employing a categorical approach, the Federal Circuit requires a court to look both to what was changed in the patent application and the reasons for the change.  Southwall Techs., Inc., 54 F.3d at 1580.  Here, it is apparent that Tittgemeyer limited his claim to "cylindrical" print cylinders in an effort to distinguish the prior art which taught the mounting of a print form on a print cylinder via a clamping channel.  Moreover, Tittgemeyer expressly defined the term "cylindrical" so as to limit the scope of his patent to cylinders without clamping channels.  As Tittgemeyer expressly adopted this broad limitation in order to obtain the patent, MAN Roland, as his successor in interest, cannot now claim that what was surrendered was limited to the precise features of the prior art.

## III.  CONCLUSION

For the foregoing reasons, I grant Heidelberg's motion for summary judgment and instruct the clerk to enter judgment for Heidelberg with respect to both its claims for a declaratory judgment of non-infringement and MAN Roland's counterclaims for infringement.  As I conclude that Heidelberg is entitled to

26

summary judgment, I also deny MAN Roland's cross-motion for

summary judgment.

SO ORDERED.


                              _____
                              Paul Barbadoro
                              Chief Judge

March 25, 1998

cc:  Thomas Donovan, Esq.
     Richard Mayer, Esq.
     Emily Rice, Esq.
     Mark Mutterperl, Esq.
     Peter Kearns, Esq.